## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOFFREY R. KAISER, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>USAA LIFE INSURANCE COMPANY and USAA LIFE INSURANCE COMPANY OF NEW YORK,<br><br>    Defendants. | Case No.:<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Geoffrey R. Kaiser, individually on behalf of himself and on behalf of all others similarly situated, brings this action, based upon personal knowledge as to himself and on information and belief as to all other matters, against USAA Life Insurance Company ("USAA Life") and USAA Life Insurance Company of New York (USAA Life NY) (together, "USAA" or "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff files this lawsuit on behalf of himself and on behalf of a class of all similarly situated consumers to vindicate their rights against the unfair, deceptive, fraudulent and illegal business practices of USAA in enforcing the provisions of certain of its term life insurance policies. Specifically, and as further detailed below, USAA executed a deliberate business strategy designed to charge the owners of USAA term life insurance policies containing "Owner-Selected Benefit Periods" and corresponding "Selected Benefit Period Expiration Dates" premiums that its insureds never agreed to pay for reduced death benefits they never selected.

2.      Plaintiffs and the Classes (defined below) bring this action for damages, restitution

and reimbursement, as well as injunctive relief, pursuant to the EFTA, New York General Business Law § 349, common law fraud, breach of contract and unjust enrichment.

## JURISDICTION AND VENUE

3.      Original subject matter jurisdiction is valid in this district pursuant to 28 U.S.C. §1331 because this case arises out of violations of federal law under the EFTA, 15 U.S.C. §§ 1693, *et seq*. Jurisdiction of this Court arises pursuant to 28 U.S.C. §§ 1331 and 1367 for supplemental jurisdiction over the state statutory and common law claims arising from the same or substantially similar transactions that form the basis of the EFTA claim

4.      The Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (i) there is minimal diversity; (ii) Defendants are not government entities against whom the District Court may be foreclosed from ordering relief; (iii) there are more than one hundred (100) people in the putative classes; and (iv) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendants. USAA Life NY maintains its headquarters in this District and is authorized to do business in New York, maintains continuous and systemic contacts with New York and this District, does business in New York and this District specifically related to the claims alleged in this Complaint, and has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. USAA Life does business in this District through its agent, USAA Life NY, which is a wholly-owned subsidiary of USAA Life and is governed by the identical executive leadership. USAA Life NY substitutes for USAA Life by executing the latter's business operations within this District and New York as a whole.

6.      Venue is proper in this District under 28 U.S.C. §1391.

## PARTIES

7.      Plaintiff is and was at all relevant times a resident of New York State.

8.      USAA Life Insurance Company is a Texas domiciled life insurance company. USAA Life is a wholly-owned subsidiary of United Services Automobile Association, a Texas reciprocal inter-insurance exchange.

9.      USAA Life Insurance Company of New York was incorporated as a stock life insurance company under the laws of the State of New York on October 1, 1997 and was licensed and commenced business on November 14, 1997.  USAA Life NY has a New York address of 529 Main Street, Highland Falls, New York 10928.  Its main administrative office is located at 9800 Fredericksburg Road, San Antonio, Texas 78288.  USAA Life NY is a wholly-owned subsidiary of USAA Life.

## RELEVANT STATUTES

### The Electronic Fund Transfer Act

10.      In enacting the Electronic Fund Transfer Act ("EFTA"), Congress found that the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers. 15 U.S.C. § 1693(a). Congress' purpose in enacting the EFTA was to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance  transfer systems." *Id*. §1693(b). "The primary objective of [the EFTA] is the provision of individual  consumer rights." *Id*.  " EFTA is intended to protect individual consumers engaging in EFTs and remittance transfers." CFPB Compliance Bulletin 2015-06 (November 23, 2015).

11.      "EFTA is implemented through Regulation E, which  includes official interpretations." *Id.* "The Dodd-Frank Wall Street Reform and  Consumer Protection Act (Dodd-Frank Act) generally transferred rulemaking  authority under EFTA from the Board of Governors

of the Federal Reserve System  ("the Board") to the Consumer Financial Protection e and Regulation E against any person subject to EFTA and Regulation.  USAA was subject to the requirements of the EFTA and Regulation E when obtaining a consumer's authorization for a preauthorized electronic fund transfer ("EFT").

12.    Regulation E requires that preauthorized EFTs from a consumer's account be authorized "only by a writing signed or similarly authenticated by the consumer."  Oral recordings obtained over the phone may authorize preauthorized EFTs under Regulation E provided that these recordings also comply with the Electronic Signatures in Global and National Commerce Act (E-Sign Act).

13.    "Whether an authorization is provided in paper form or electronically, to comply with Regulation E, the authorization must be readily identifiable as such to the consumer and the terms of the preauthorized EFTs must be clear and readily understandable to the consumer. *Id.* The authorization process also should evidence the consumer's identity and assent to the authorization." *Id.*  Furthermore, a copy of the terms of the authorization must also be provided to the consumer.  "Two of the most significant terms of an authorization are the timing ***and amount*** of the recurring transfers from the consumer's account." *Id.* (emphasis added).

14.    Violations of the EFTA and Regulation E may result in civil and criminal liability. 15 U.S.C. §§ 1693m and 1693n.  Further, a lawsuit for violations of the EFTA may be maintained as a class action, with total recovery for any class action "arising out of the same failure to comply by the same person" authorized in an amount not to exceed to $500,000. 15 U.S.C. § 1693m(a)(1)(B).  A successful plaintiff may also recover attorney's fees. *Id.* at (a)(3).

**New York General Business Law Section 349**

15.     New York General Business Law § 349(a) declares all "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in" New York State unlawful.  The statute grants a private right of action to "any person who has been injured by reason of any violation" of the statute.  § 349(h).  A prevailing plaintiff may also be awarded reasonable attorney's fees.  *Id.*

16.     "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Id.* (citation omitted). "A deceptive practice, however, need not reach the level of common-law fraud to be actionable under section 349." *Id.* While a plaintiff must prove actual injury to recover under the statute, it is not necessary to prove "pecuniary harm." *Id.* Nor are an "intent to defraud" or "justifiable reliance" elements of a claim. *Id.* "The plaintiff, however, must show that the defendant's 'material deceptive act' caused the injury." *Id.* (citation omitted).  An action seeking actual damages under section 349 may be maintained as a class action. *See Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dept. 2004).

## FACTS SUPPORTING THE ALLEGATIONS

**The Policy**

17.     In or about late 2001, Plaintiff applied for a 20-year New York Term Series IV Life Insurance Policy ("the Policy") from USAA Life NY.  The Policy that subsequently issued carried a death benefit of $1,500,000 and included a cover sheet stating, in relevant part:

**THIS IS A TERM LIFE INSURANCE POLICY WITH AN OWNER-SELECTED BENEFIT PERIOD FOLLOWED BY A DECREASING BENEFIT PERIOD.**

PREMIUMS ARE GUARANTED TO BE LEVEL FOR THE FIRST FIVE YEARS.

**THE DEATH BENEFIT REMAINS THE SAME DURING THE SELECTED BENEFIT PERIOD.**

**UPON EXPIRATION OF THE SELECTED BENEFIT PERIOD, THE AMOUNT OF INSURANCE DECREASES ANNUALLY.**

THE POLICY MAY BE CONVERTED TO A PERMANENT LIFE INSURANCE POLICY . . . .

(emphasis added).  Any consumer reading this language, especially given the declining death benefits after expiration of the "Owner-Selected Benefit Period" and the *option* to extend the policy through conversion to a permanent life insurance policy, would reasonably assume that the Policy was operative only during the period *selected by the Owner* and then would expire unless the "Owner" made another "Selection," either by choosing to continue paying premiums for reduced death benefits or to convert the term policy into a permanent one.  The Policy contained *no language* stating that USAA Life NY reserved the right to continue billing Plaintiff for reduced death benefits beyond the "Owner-Selected Benefit Period" without first obtaining the Owner's authorization and consent, or that the Owner was required to take some affirmative action to cancel the Policy to prevent such a result.

18.     Page 2 of the policy was captioned "Insurance Schedule."  The Insurance Schedule listed, inter alia, the "Contract Number" assigned to the Policy (G300078175), the "Effective Date" (January 3, 2002), the "Initial Amount of Insurance" ($1,500,000.00), the "Plan of Insurance" (20 Year New York Term Series IV), the "Total First Premium" (semi-annual) of $1,336.40, the "Selected Benefit Period" (20 Years), and the "Selected Benefit Period Expiration

Date" (January 3, 2022).  Plaintiff was listed as both the "Insured" and the "Owner" of the Policy.

The bottom of the Insurance Schedule carried a footer listing the Policy Form Number

(NLT31178NY 10-97) and the policy term of "20 Years."

19.     Although the Insurance Schedule did not list any other "Selected Benefit Period"

or "Selected Benefit Period Expiration Date," it nonetheless misleadingly included a "Final

Expiration Date" of January 3, 2043, which appeared to correlate to an attached schedule of

declining benefit amounts extending beyond the "Selected Benefit Period" through January 2042.

The Insurance Schedule also listed a "Conversion Option Expiration Date" of January 3, 2023,

which was the deadline by which to convert the Policy, if Plaintiff so chose, into a permanent

policy of insurance.   However, everything about the information provided on the Insurance

Schedule indicated that the "Owner" had "Selected" only a benefit period of "20 Years," expiring

on January 3, 2022.  ***Nothing*** in the Insurance Schedule indicated that the "Owner" had "Selected"

the Policy to continue beyond the 20-year term by a single day, much less evidenced any intention

by the Owner to continue paying premiums ***for reduced death benefits*** through a "Final Expiration

Date" of January 3, 2043.

20.     Page 2A of the Policy was captioned "Premium Schedule."  The Premium Schedule

again listed the "Contract Number" assigned to the Policy (G300078175) and summarized the

"Guaranteed Premiums for First Five Years from Effective Date," which totaled $2,570.00

annually.  The Premium Schedule listed the Policy "Form Number" (NLT31178NY 10-97), the

Policy "Benefits" (20 Year New York Term Series IV), the "Amount of Insurance" ($1,500,000),

the "Current Semi-Annual Premium" ($1,336.40) and "Years Guaranteed" (5). Like the Insurance

Schedule, the bottom of the Premium Schedule carried a footer repeating the Form Number and

the policy term of "20 Years."  Again, all information listed in the Premium Schedule reflected the

Owner's selection of a 20-year term policy without any indication that the Owner had ever agreed to coverage beyond that date.

21.     The Policy confusingly included two different schedules of premiums, one for "Guaranteed Premiums" and one for "Current Premiums."   The "Current Premiums" schedule listed the same level term annual premium of $2,570.00 but extended the premium payments beyond the Selected Benefit Period through January 3, 2042, with precipitously declining death benefits that dropped from $1,500,000 to $82,500.  The "Guaranteed Premiums" schedule included exactly the same declining death benefit amounts starting in January 2022, but listed annual premiums that sharply increased five years after the Policy's effective date, spiking from $2,570.00 in January 2006 to as much as $22,580.00 in January 2021 and then fluctuating in varying amounts ranging from $18,665.00 in January 2021 to $10,205.00 in January 2042.  The Policy included language stating that USAA "expected" to charge Plaintiff the "Current Premium" but could charge as much as the "Guaranteed Premium."

22.     The Policy included a Definitions section. "You or Your" was defined to mean "the Owner of the policy" (i.e., Plaintiff).  "We, Our or Us" was defined to mean "USAA Life Insurance Company of New York."  "Selected Benefit Period" was defined as ***"the time period selected by the Owner during which the death benefit remains the same.*** It begins on the Effective Date as shown on the Schedule Page." (Emphasis added) "Selected Benefit Period Expiration Date" was defined as "the date upon which the Selected Benefit Period ends.  This is the date when the death benefit begins to decrease annually."   "Final Expiration Date" was defined as "the policy anniversary date following the Insured's 80th birthday or after the policy has been in force for 50 years," which was thirty years beyond the "Selected Benefit Period" chosen by the Owner (i.e., Plaintiff) and described on the Policy schedules.

23.     The Policy language stated, inter alia, that the Policy was "a legal contract between the Company and the Owner" and that "[t]he policy and the application form the entire contract." The Policy stated that "[o]nly an officer of [USAA Life Insurance Company of New York] has authority to . . . agree with the Owner to any changes in the policy, and then only in writing." Importantly, the Policy contained a section captioned "Method of Payment" which stated:

> **Premiums may be paid by any method and interval agreed to by the parties.**  Payment intervals are measured from the Effective Date of the policy.  **The method of payment may be changed by writing to Us.  If a premium is not paid when due, the policy will terminate except as indicated elsewhere in the policy.**

(Emphasis added).  Accordingly, as per the Policy's express terms, if premium payments ended after the "Owner-Selected Benefit Period" of twenty years, and without there having been any conversion of the Policy into a permanent policy of insurance as otherwise permitted under the "Conversion Option," the Policy would terminate.

**USAA Fraudulently Debited Plaintiff's Bank Account
To Make Unauthorized Premium Payments Beyond The
The Policy's Selected Benefit Period Expiration Date**

24.     Since Plaintiff had only "Selected" a benefit period of 20 years for a level death benefit of $1,500,000, USAA's efforts to collect premium payments for reduced death benefits beyond the Selected Benefit Period, without first seeking and obtaining Plaintiff's authorization and consent to that new arrangement or "Selection," was an inherently unfair, deceptive and misleading business practice, a material breach of the Policy and a gross fraud against Plaintiff. This is especially true given the inclusion of repeated references throughout the Policy to a term of "20 Years" alongside deliberately deceptive and ambiguous references to a "Final Expiration Date," the combined effect of which plainly suggested that Plaintiff, in addition to having the option of converting the Policy to permanent insurance, also had an option to extend his term

coverage beyond the "Selected Benefit Period" by making an election to continue paying premiums for sharply reduced death benefits after that date.

25.    Plaintiff, however, would have had no reason to know based on the Policy's wording that USAA had reserved for itself the right to continue billing him premium amounts beyond the 20-year term that the Policy explicitly stated Plaintiff had "Selected" in exchange for markedly reduced death benefits during an involuntarily extended Policy term that Plaintiff had **never** selected.  Nor did the Policy include any language or provision requiring that Plaintiff take some affirmative action to cancel the Policy in order to avoid the continued billing of premium payments and an involuntary extension of the Policy term.  On the contrary, the Policy stated that it would terminate automatically if Plaintiff stopped making premium payments, indicating that it was always supposed to be Plaintiff's choice under the Policy whether to pay for coverage and Plaintiff had only ever chosen one coverage term – *i.e.*, the "Owner-Selected Benefit Period" of 20 Years.

26.    USAA's misconduct was only compounded by its unlawful conversion of Plaintiff's assets through the illegal use of automatic electronic fund withdrawals from Plaintiff's bank account at Bank of America in violation of the Policy and federal law.

27.    Specifically, in a cover letter addressed to Plaintiff's spouse dated August 13, 2020 – about sixteen months prior to expiration of the Selected Benefit Period of Plaintiff's Policy – USAA purported to confirm that it had obtained phone authorization from Plaintiff's spouse "for automatic payment on your life insurance policy from USAA Life Insurance Company of New York."  The cover letter, however, was accompanied by two separate written confirmation receipts allegedly documenting "Automatic Payment Plan Authorization and Terms."  One of the confirmations pertained to a USAA life insurance policy owned by Plaintiff's spouse, but the other

confirmation pertained to Plaintiff's Policy.

28.     Each of the confirmation receipts purported to authorize USAA to withdraw money from a Bank of America joint checking account at regular intervals to make premium payments. However, in violation of the Electronic Funds Transfer Act and Regulation E, neither confirmation receipt listed a withdrawal amount or reflected Plaintiff's assent to the authorization and USAA never provided a copy of the confirmation pertaining to Plaintiff's Policy to Plaintiff. Indeed, although one of the confirmation receipts referenced Plaintiff's name and the Contract Number of Plaintiff's Policy, the cover letter enclosing both confirmations was addressed only to Plaintiff's spouse and made reference only to her (i.e., "Your") life insurance policy.

29.      Furthermore, USAA had no authority to unilaterally change the method of payment on Plaintiff's Policy under the Policy's express terms.  Up until that time, premium payments on the Policy were being paid by check, not automatic fund withdrawal.  Plaintiff's spouse was not an Owner or Insured under the Policy, and USAA knew she had no authority to change the method of payment, which could only be done in a "writing" to USAA Life NY by Plaintiff, as the Owner of the Policy.

30.     USAA nonetheless began withdrawing funds from the checking account that Plaintiff jointly held with his spouse and unlawfully converted those funds to pay semi-annual premiums on Plaintiff's Policy through at least in or about February 2024, more than two full years after expiration of the "Selected Benefit Period."  USAA did so notwithstanding that it had never sought or obtained the authorization of Plaintiff, as the Owner of the Policy, to change the method of payment on the Policy to an automatic payment plan, as required by the express terms of the Policy and despite failing to comply with the Electronic Funds Transfer Act and Regulation E by not providing a copy of the confirmation to Plaintiff, and not listing the amount of the automatic

withdrawal or providing evidence of Plaintiff's assent to the authorization on the confirmation.

Nor had USAA sought or obtained Plaintiff's agreement to continue paying premiums beyond the

20-year "Selected Benefit Period" which Plaintiff had purchased, after which death benefits

declined precipitously.

31.     Plaintiff did not discover that USAA was converting funds through automatic

withdrawals from his bank account to pay premiums in violation of the Policy terms until in or

about February 2024.  By that time, USAA had taken seven semi-annual premium payments of

$1,336.40 from Plaintiff's bank account through automatic withdrawals, four of which had been

used to pay premiums for much reduced death benefits beyond the "Selected Benefit Period

Expiration Date" of January 3, 2022.  If USAA had not converted these funds in violation of the

Policy terms and without Plaintiff's knowledge or authorization, the Policy would have expired of

its own accord once the "Selected Benefit Period" ended and Plaintiff stopped submitting premium

checks to USAA through the mail, as had been the established practice under the Policy before

USAA changed the method of payment in violation of the Policy terms.  USAA, however, did not

give Plaintiff that option since it did not seek his approval to extend the Policy beyond the

"Selected Benefit Period" or to begin accepting premium payments through automatic

withdrawals.

32.     Once Plaintiff discovered USAA's deception and misconduct, in or about February

2024, Plaintiff contacted USAA.  Plaintiff explained that he had never authorized a continuation

of the Policy beyond the "Selected Benefit Period Expiration Date," nor had he authorized USAA

to make automatic withdrawals from his bank account to pay premiums beyond that date.

Furthermore, Plaintiff advised USAA that he knew and expected that his Policy would be expiring

in January 2022 and he had taken steps to replace that life insurance coverage with new coverage

from another insurance company.  Plaintiff demanded that USAA refund all of the premiums that they had paid without Plaintiff's authorization beyond the "Selected Benefit Period Expiration Date."  USAA, however, agreed only to refund $1,096.53, which was just a portion of the most recent premium payment paid in January 2024.

33.    Plaintiff thereafter made additional calls to USAA in an attempt to escalate the issue for resolution and receive a full refund of all unauthorized premium payments beyond the "Selected Benefit Period Expiration Date."  Plaintiff explained that he never intended to continue paying premiums for reduced death benefits and had not authorized USAA to extend the period of coverage beyond the "Selected Benefit Period" without his consent through automatic withdrawals from his bank account that he had never requested.  Plaintiff explained that this was a violation of the Policy terms, a grossly deceptive and exploitative business practice and a fraud against Plaintiff, as USAA's insured.  Plaintiff advised USAA that it was required to seek his authorization and consent under the Policy to extend coverage and continue billing premiums beyond the "Selected Benefit Period," as he had never chosen any other or lesser coverage than the 20-year level term originally selected.

34.    Plaintiff further advised USAA that it was required by the Policy terms to seek his permission to change the method of payment under the Policy from paper check to automatic withdrawals from the joint checking account held with his spouse.  Plaintiff explained that USAA's conversion of funds without Plaintiff's knowledge or authorization had worked a fraud against Plaintiff, who would not have knowingly consented to continue paying premiums beyond the "Selected Benefit Period" for sharply reduced death benefits.

35.    In response, USAA asserted that Plaintiff was required to affirmatively cancel the policy to avoid further premium charges beyond the "Selected Benefit Period" notwithstanding

that Plaintiff only selected a benefit period lasting 20 years with a level death benefit of $1,500,000, and despite the fact that the Policy would have expired automatically once Plaintiff stopped submitting premium checks through the mail. Moreover, the Policy contained no language referencing any obligation of Plaintiff to cancel the Policy to avoid an involuntary extension of the Policy term and the continued billing of premiums. Indeed, it was only because USAA had secretly converted funds from Plaintiff's checking account to continue making premium payments without his knowledge or permission that the Policy had continued in force well beyond the only coverage period that Plaintiff had ever "Selected."

36.     USAA further claimed that Plaintiff's spouse had been authorized as a "payer" under the Policy and that she had provided her voice authorization in August 2020 for automatic withdrawals, although USAA acknowledged that it had not maintained a voice recording of the alleged authorization. USAA instead provided a copy of the alleged "confirmation" of that authorization, referenced in paragraph __ above. As noted, the confirmation provided by USAA was addressed to Plaintiff's spouse, not Plaintiff, and did not comply with the Electronic Funds Transfer Act or Regulation E in any event. Moreover, as Plaintiff explained to USAA on the phone, even assuming *arguendo* that Plaintiff's spouse had been authorized by Plaintiff at some point during the life of the Policy to submit payments on Plaintiff's behalf, Plaintiff's spouse still was not an Owner of the Policy and therefore **could not change the method of payment** under the Policy without Plaintiff's authorization.

37.     On information and belief, the unlawful conduct described above infects all of USAA's term life insurance operations in the United States. Based on admissions made by USAA in recorded phone calls, USAA routinely employs unfair and deceptive business practices by continuing to bill and collect premiums beyond the "Owner-Selected Benefit Period," without the

policy owner's authorization or consent, for the purpose of fraudulently extracting additional premium payments while providing insureds with substantially reduced death benefits. USAA also routinely debits the bank accounts of policy owners in violation of federal law and without their knowledge or consent. USAA then uses those unlawfully converted funds to make premium payments in violation of policy requirements, thereby forcing an extension of coverage for substantially reduced death benefits beyond the "Owner-Selected Benefit Period" and without the knowledge or consent of its insureds.

**<u>CLASS ACTION ALLEGATIONS</u>**

38.    Plaintiff bring this action as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the following "Nationwide Class:"

> All natural persons in the United States and its territories who were sold a term life insurance policy by USAA with an "Owner-Selected Benefit Period" and who were charged premiums by USAA without the policy owner's authorization or consent after the "Selected Benefit Period" expired through automatic payments from the policy owner's bank account in violation of the EFTA.

39.    Plaintiff further bring this action as a class action pursuant to FED. R. CIV. P. 23, on behalf of himself and the following "New York Subclass:"

> All members of the Nationwide Class who resided in New York on the dates of one or more of the automatic payments.

40.    For purposes of this Complaint, the term "Classes" refers collectively to the Nationwide Class and the New York Subclass and the phrase "Class Members" refers to all members of the Classes.

41.    Excluded from the Classes are Defendants and their parent(s), subsidiary(ies), officers, directors, employees, partners and co-venturers. Also excluded are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members

of his/her   immediate family and judicial staff assigned to this action.

42.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or further divide the Classes into subclasses or limit the Classes to particular issues, based   on the results of discovery.

43.    This action has been brought and may properly be maintained as a class action against Defendant pursuant to the provisions of FED. R. CIV. P. 23 because there is a well-defined community   of interest in the litigation and there is an administratively feasible way to identify Class Members.

44.    **Numerosity of the Class. Rule 23(a)(1).** The members of the Classes are so numerous that their individual joinder is impracticable. Inasmuch as the Class Members may be   identified through business records regularly maintained by USAA and its employees and agents,   and through the media, the number and identities of Class Members can be ascertained. Members of the Classes can be notified of the pending action by e-mail, mail, and supplemented by published   notice, if necessary.

45.    **Existence and Predominance of Common Question of Law and Fact.  Rule 23(a)(2) and 23(b)(3).**  There are questions of law and fact common to the Classes.  These questions predominate over any questions affecting only individual Class Members.  These common legal and   factual issues include, but are not limited to:

      a.    Whether  Defendants sold a term life insurance policy with an "Owner-Selected Benefit Period" and "Selected Benefit Period Expiration Date" to Plaintiff and other Class Members;

      b.    Whether  Defendants continued to charge Plaintiff and other Class Members premiums without their authorization or consent after the "Owner-Selected Benefit Period" in their policies had already expired and the death benefits under those policies had started to decrease;

c.   Whether USAA withdrew funds from the bank accounts of Plaintiff and other Class Members through electronic fund transfers in violation of the EFTA in order to pay policy premiums for decreasing death benefits after the "Owner-Selected Benefit Period" in their policies had already expired;

d.   Whether USAA has engaged in unfair, deceptive and/or unconscionable acts, practices, statements or omissions under NY  General Business Law § 349;

e.   Whether Plaintiff and other Class Members are entitled to maximum statutory damages, costs, and fees under the EFTA and NY General Business Law § 349;

f.   Whether USAA has committed common law fraud against Plaintiff and other Class Members;

g.   Whether USAA has committed breach of contract;

h.   Whether USAA has been unjustly enriched by its illegal and inequitable conduct;

i.   Whether USAA must provide damages, restitution and/or reimbursement to Plaintiff and other Class Members as a consequence of its misconduct; and

j.   Whether injunctive relief is appropriate to prohibit USAA from engaging in this misconduct in the future.

46.   **Typicality. Rule 23(a)(3).** The claims of the representative Plaintiff are typical of the claims of each member of the Classes. Plaintiff, like all other members of the Classes, has sustained damages arising from USAA's violations of the laws, as alleged herein. The representative Plaintiff and the members of the Classes were and are similarly or identically harmed  by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in  by Defendant.

47.   **Adequacy. Rule 23(a)(4).** The representative Plaintiff will fairly and adequately represent and protect the interests of the Class Members and has retained counsel who are experienced  and competent trial lawyers in complex litigation. There are no material  conflicts

between the claims of the representative Plaintiffs and Class Members that would make class certification inappropriate.  Counsel for the Plaintiffs and the Classes will vigorously assert the claims of all Class Members.

48.    **Injunctive and Declaratory Relief. Rule 23(b)(2).** USAA's actions regarding its unlawful premium charges to insureds and automatic debiting of insured bank accounts to pay such premiums in violation of the EFTA are uniform as to members of the Classes. USAA has acted or refused to act on grounds that apply generally to the Classes so that final injunctive relief as requested  herein is appropriate with respect to the Classes as a whole.

49.    **Predominance and Superiority of Class Action. Rule 23(b)(3).** This suit may be maintained as a class action because questions of law and fact common to the Classes predominate over the questions affecting only individual members of the Classes and a class action is superior to  other available means for the fair and efficient adjudication of this dispute. The damages suffered by  individual Class Members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address USAA's conduct. Further, it would be   virtually impossible for the Class Members to individually redress effectively the wrongs done to them.  In addition, individualized litigation increases the delay and expense to all parties and to the court  system resulting from complex legal and factual issues of the case. Individualized litigation also  presents a potential for inconsistent or contradictory judgments. By contrast, the class action device  presents far fewer management difficulties; allows the hearing of claims which might otherwise go  unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits   of single adjudication, economies of scale, and comprehensive supervision by a single court.

50.    **Plaintiff** contemplates the eventual issuance of notice to the proposed Class

Members  setting forth the subject and nature of the instant action. Upon information and belief,
USAA's own business records and electronic media can be utilized for the contemplated notices.
To the extent  that any further notices may be required, the representative Plaintiff would
contemplate the use of  additional media and/or mailings.

## FIRST CAUSE OF ACTION

**Violation of Electronic Funds Transfer Act and Regulation E**
**(On Behalf of Plaintiff and the Classes)**

51.     Plaintiff repeats and incorporates the allegations herein.

52.     By virtue of Defendant's violation of the Electronic Funds Transfer Act and
Regulation E, the putative classes has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

**Violation of the NY General Business Law Section 349**
**(On Behalf of Plaintiff and the Classes)**

53.     Plaintiff repeats and incorporates the allegations herein.

54.     By virtue of Defendant's violation of NY General Business Law Section 349, the
putative classes has been damaged in an amount to determined at trial.

## THIRD CAUSE OF ACTION

**Common Law Fraud**
**(On Behalf of Plaintiff and the Classes)**

55.     Plaintiff repeats and incorporates the allegations herein.

56.     By virtue of Defendant's fraudulent conduct, the putative classes has been
damaged in an amount to determined at trial.

**FOURTH CAUSE OF ACTION**

**Breach of Contract**
**(On Behalf of Plaintiff and the Classes)**

57.     Plaintiff repeats and incorporates the allegations herein.

58.     By virtue of Defendant's breach of contract, the putative classes has been damaged in an amount to determined at trial.

**FIFTH CAUSE OF ACTION**

**Conversion**
**(On Behalf of Plaintiff and the Classes)**

59.     Plaintiff repeats and incorporates the allegations herein.

60.     By virtue of Defendant's conversion, the putative classes has been damaged in an amount to determined at trial.

**PRAYER FOR RELIEF**

**Wherefore**, Plaintiffs ask the Court to enter a judgment:

1.     Certifying of the Classes pursuant to FED. R. CIV. P. 23, certifying Plaintiff as the  representative of the Classes, and designating its counsel as counsel for the Classes;

2.     Declaring that Defendants have violated the EFTA and Regulation E;

3.     Declaring that Defendants have violated New York GBL §349.

4.     Declaring that Defendants are liable for common law fraud.

5.     Declaring that Defendants are liable for breach of contract.

6.     Declaring that Defendants are liable for conversion.

7.     Granting  damages,  statutory  damages  where  applicable,  exemplary  damages where  applicable, restitution and/or disgorgement to Plaintiff and the Classes, and the creation of a  constructive  trust  for  the  benefit  of  Plaintiff  and  the  Classes,  the  amounts  of  which  a r e

to be determined at trial;

8.    Granting declaratory and injunctive relief to enjoin Defendants from engaging in the unlawful conduct described in this Complaint;

9.    Granting punitive damages;

10.   Granting pre- and post-judgment interest;

11.   Granting attorneys' fees and costs; and

12.   Granting further relief as this Court may deem proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  New York, New York
        May 2, 2024

Respectfully submitted,

**KAISER SAURBORN & MAIR P.C.**

By: _____
        Daniel J. Kaiser
        William H. Kaiser
        30 Broad Street, 37th Floor
        New York, New York 10004
        Telephone No. (212) 338-9100
        Facsimile No. (212) 338-9088
        kaiser@ksmlaw.com

*Attorneys for Plaintiff and Proposed Classes*