UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEOFFREY R. KAISER, on behalf of himself and all others similarly situated,<br><br>           Plaintiff,<br><br>           v.<br><br>USAA LIFE INSURANCE COMPANY AND USAA LIFE INSURANCE COMPANY OF NEW YORK,<br><br>           Defendants. | 24 Civ. 3409 (DEH)<br><br>**<u>OPINION</u>**<br>**<u>AND ORDER</u>** |

DALE E. HO, United States District Judge:

This case arises out of a life insurance policy that Plaintiff Geoffrey Kaiser ("Kaiser") entered with USAA Life Insurance Company of New York ("USAA Life NY").  Kaiser's complaint alleges that the policy's language was deceptive and misleading; that Defendants breached the contract, committed fraud, engaged in deceptive business practices, illegally converted his money by continuing to charge Kaiser beyond what he believed to be the expiration date; and that Defendants changed the method of payment without his consent in violation of the Electronic Funds Transfer Act.  First Am. Class Action Compl. ("FAC"), ECF No. 53.  Defendants have moved to dismiss the claims.  Defs.' Mot. Dismiss, ECF No. 54.  For the reasons discussed below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Unless otherwise stated, the following facts are taken from the Amended Complaint and are assumed to be true solely for the purposes of adjudicating Defendants' motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

In late 2001, Kaiser took out a 20-year New York Term Series IV life insurance policy ("the policy") from USAA Life NY that carried a death benefit of $1,500,000.  FAC ¶ 17.  The

policy was a legal contract between Kaiser (the "Owner") and USAA Life NY (the "Company"), *id.* ¶¶ 22-23, and its cover page included a summary of its terms:

> THIS IS A TERM LIFE INSURANCE POLICY WITH AN OWNER-SELECTED BENEFIT PERIOD FOLLOWED BY A DECREASING BENEFIT PERIOD.
>
> PREMIUMS ARE GUARANTEED TO BE LEVEL FOR THE FIRST FIVE YEARS.
>
> THE DEATH BENEFIT REMAINS THE SAME DURING THE SELECTED BENEFIT PERIOD.
>
> UPON EXPIRATION OF THE SELECTED BENEFIT PERIOD, THE AMOUNT OF INSURANCE DECREASES ANNUALLY.
>
> THIS POLICY MAY BE CONVERTED TO A PERMANENT LIFE INSURANCE POLICY.
>
> THIS POLICY IS NOT PARTICIPATING -- NO ANNUAL DIVIDENDS ARE PAID.

Defs.' Mem. Law Supp. Mot. Dismiss ("Defs.' Supp."), Ex 1, at 1, ECF No. 55-1; *see also* FAC ¶ 17.

The details of the policy expounded on these terms. According to the policy's "Insurance Schedule," Kaiser's "Selected Benefit Period" of 20 years was set to expire on January 3, 2022 and, because of the policy's decreasing benefit period, the policy's "Final Expiration Date" was listed as January 3, 2043. FAC ¶¶ 18-19. The policy's "Premium Schedule" included both "Guaranteed Premiums," that fluctuated in amount over the course of 40 years, and "Current Premiums," that remained stable over the course of the same period. FAC ¶ 21. Both the Guaranteed and Current premium schedule reflected a declining death benefit after 20 years. *Id.* If Kaiser desired to convert the policy to a permanent policy of insurance, he had to do so by January 3, 2023. *Id.* ¶ 19.

The policy also included key definitions. "Selected Benefit Period" was defined as "the time period selected by the Owner during which the death benefit remains the same," beginning on January 3, 2002. *Id.* ¶ 22. "Selected Benefit Period Expiration Date" was defined as "the date upon which the Selected Benefit Period ends" and "when the death benefit begins to decrease annually." *Id.* "Final Expiration Date" was defined as "the policy anniversary date following the Insured's 80th birthday or after the policy has been in force for 50 years." *Id.*

2

According to the policy's terms, "[o]nly an officer of the Company ha[d] authority to . . . agree with the Owner to any changes in the policy, and then only in writing." *Id.* ¶ 23.  It further specified that changes to the payment method also had to be in writing, and only by the parties to the policy:

**METHOD OF PAYMENT**
Premiums may be paid by any method and interval agreed to by the parties. Payment intervals are measured from the Effective Date of the policy. The method of payment may be changed by writing to Us. If a premium is not paid when due, the policy will terminate except as indicated elsewhere in the policy.

Defs.' Supp., Ex 1, at 12.

In August of 2020, about sixteen months before the Selected Benefits Period was set to expire, USAA Life NY sent Kaiser's wife, Mrs. Kaiser, a confirmation letter stating that it had received phone authorization from her to change the method of payment of the premiums on Kaiser's policy to automatic withdrawal from the Kaiser family's jointly held bank account.  FAC ¶¶ 27-28; *see also* Defs.' Supp., Ex. 2, ECF No. 55-2.  Kaiser himself never received a copy of the authorization letter.  FAC ¶ 28.  Because Mrs. Kaiser, and not Kaiser, managed and reviewed their bank statements, Kaiser never suspected that his payment method had changed.  *Id.* ¶ 29.

After the purported authorization, USAA Life NY began withdrawing money on a semi-annual basis from the Kaiser family bank account.  *Id.* ¶ 31.  On January 3, 2022, the "Selected Benefit Period" expired, and USAA Life NY continued to automatically debit Kaiser's bank account twice a year to cover the policy's premiums, which amounted to $2,672.80 annually, or $1,336.40 semi-annually.  *Id.* ¶ 32.  Kaiser did not discover these withdrawals until around February 2024, at which point he contacted USAA Life NY and demanded a refund for all the payments he made beyond the "Selected Benefit Period" expiration date, which was when he expected the policy to have ended.  *Id.* ¶¶ 32-33.  USAA Life NY agreed to issue a refund to Kaiser in the amount of $1,096.53, which was less than the most recent semi-annual payment he had

made.  *Id.* ¶ 33.  Kaiser continued to seek resolution, but USAA Life NY said that Kaiser "was required to affirmatively cancel the policy to avoid further premium charges beyond the 'Selected Benefit Period[.]'"  *Id.* ¶¶ 34-36.  USAA Life NY further stated that Mrs. Kaiser's authorization of the change to the method of payment was acceptable because she had been authorized as a "payer" under the policy.  *Id.* ¶ 37.

On May 2, 2024, Kaiser filed a class action lawsuit against Defendants alleging that they violated the Electronic Funds Transfer Act ("EFTA") (Count 1), violated § 349 of New York's General Business Law ("GBL") (Count 2), committed common law fraud (Count 3), breached their contract (Count 4), and illegally converted funds (Count 5).  *Id.* at 21-22.  On December 6, 2024, Defendants moved to dismiss, ECF No. 54, raising jurisdictional arguments and asserting that Kaiser failed to state a claim.  *See generally* Defs.' Supp.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[1]  "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff[']s] favor."  *Id.* at 106-07.  The court may also "consider . . . documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  However, the court must disregard any "conclusory allegations, such as 'formulaic recitation[s] of the elements of a cause of action.'"  *Sacerdote*, 9 F.4th at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A complaint is

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'" *Rubenstetn v. Ishizuka*, No. 23 Civ. 4332, 2025 WL 1489375, at *2 (S.D.N.Y. May 23, 2025) (quoting *Bell Atl. Corp.*, 550 U.S. at 558).

A complaint alleging fraud must also satisfy heightened pleading requirements set forth in Fed. R. Civ. P. Rule 9(b). *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Rule 9(b) requires that "a party . . . state with particularity the circumstances constituting fraud or mistake." In concrete terms, this means that "a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

## DISCUSSION

Defendants raise various jurisdictional issues, challenging Kaiser's standing to bring claims against USAA life and to seek injunctive relief, and also contesting venue. Defendants also contend that the FAC fails to adequately plead: (1) a breach of any policy provision; (2) that the premium payments were unauthorized pursuant to the EFTA; (3) that the policy was deceptive and consumer-oriented in violation of GBL § 349; (4) any fraudulent conduct; and (5) any conversion independent from the alleged breach of contract. Defendants also assert that many of Kaiser's claims are time-barred. The Court takes each of these issues in turn.

### I.  Jurisdiction

#### A.  Standing

Defendants raise two arguments that Kaiser lacks standing to bring claims against USAA Life. First, Defendants contend that Kaiser does not have standing to assert breach of contract claims against USAA Life because only USAA Life NY, not USAA Life, is a party to the policy. Defs.' Supp., ECF No. 55, at 5-6. Second, Defendants assert that Kaiser does not have standing

to bring tort or statutory claims against USAA Life because only USAA Life NY, not USAA Life, is alleged to have sought authorization from Mrs. Kaiser rather than Kaiser. *Id.* at 6-7. Defendants also argue that Kaiser cannot establish standing for injunctive relief because he has not shown a threat of future harm. *Id.* at 7.

      1.      Claims against USAA Life

To have standing, a plaintiff "must have suffered an injury in fact" that is "concrete and particularized," that injury must be "fairly traceable" to the defendant, and it must be "likely" that the injury can be "redressed by a favorable decision" from the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1982). "When a motion under Rule 12(b)(1) is based solely on the complaint and the attached exhibits, the plaintiff bears no evidentiary burden and the district court must evaluate whether those documents allege facts that plausibly suggest that the plaintiff has standing to sue." *SM Kids, LLC v. Google LLC.*, 963 F.3d 206, 210 (2d Cir. 2020).

This Court has already held that Kaiser has plausibly alleged that he has standing to bring claims against USAA Life, concluding that Kaiser validly alleges that USAA Life NY is a subsidiary of USAA Life, a foreign parent. ECF No. 51 at 2-3. USAA Life's top executives are also USAA Life's top executives. FAC ¶¶ 53-61. And, USAA Life and USAA Life NY act as one entity in the marketing, delivery, and management of the sale of insurance products in New York. FAC ¶¶ 52-61. These facts are sufficient to establish that USAA Life is a foreign parent of USAA Life NY, a local subsidiary, for the purposes of a motion to dismiss. ECF No. 51 at 3. If the agency theory holds, USAA Life has control of USAA Life NY, and actions undertaken by both USAA Life and USAA Life NY appropriately would be the cause of the injury-in-fact, and relief would address the injury. USAA Life's motion to dismiss for lack of personal jurisdiction is **DENIED**.

2.    Injunctive Relief

To seek injunctive relief, the named plaintiff must have some future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Kaiser asserts no facts in the complaint to suggest that the harms alleged are ongoing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Twombly*, 550 U.S. at 570). For these reasons, Kaiser's request for injunctive relief is **DISMISSED**.

**B.    Venue**

A motion to dismiss for improper venue "is scrutinized under the same standard" as a motion to dismiss for lack of personal jurisdiction "and, when brought on the pleadings, the Court must draw all reasonable inferences in favor of the plaintiff." *In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 252 (S.D.N.Y. 2024). Venue is governed by 28 U.S.C. § 1391, which states that "[e]xcept as otherwise provided by law . . . this section *shall* govern the venue of *all civil actions* brought in district courts of the United States" § 1391(a)(1) (emphasis added). Accordingly, a civil action may be brought in one of three places: "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* at § 1391(b). "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b). If it does, venue is proper" and "[a]s a result, a case filed in a district that falls within § 1391 may not

7

be dismissed under . . . Rule 12(b)(3)." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct, for W. Dist. of Texas*, 571 U.S. 49, 56 (2013).

Here, the requirements of § 1391(b) are met because all the Defendants reside in New York. For venue purposes, corporate entities like USAA Life "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." § 1391(c)(2). As discussed above, and in the Court's prior ruling, ECF No. 51, USAA Life is subject to this Court's personal jurisdiction, so is deemed to reside in New York. Thus, venue is proper and Defendants' motion to dismiss for improper venue is **DENIED**.

## II.    Electronic Funds Transfer Act

Kaiser contends that Defendants violated the EFTA, 15 U.S.C. § 1693 et seq., because Defendants failed to obtain his written authorization before withdrawing funds from his bank account. FAC ¶¶ 26-30. Defendants argue that they satisfied the requirements of the EFTA because they received verbal authorization from Mrs. Kaiser—an authorized payee on the policy and an account holder on the bank account from which the funds were withdrawn—and sent written confirmation. Defs.' Supp. at 14-16.

### A.    Statute of Limitations

The EFTA has a one-year statute of limitations, accruing  upon "the occurrence of the violation." 15 U.S.C. § 1693m(g). The parties, however disagree as to when a "violation" occurs in the context of recurring payments. Defendants argue that in such cases, the "violation" occurs after the first transaction, such that the cause of action accrues for any subsequent recurring transactions once the *first* transfer is made. Defs.' Supp. at 14. Kaiser, on the other hand, argues that each withdrawal amounts to a discrete violation, which would mean that the statute of limitations is triggered with each independent transfer. Pl. Mem. Law Opp'n Mot. Dismiss ("Pl.

Opp'n"), ECF No. 47, at 14-15.  For reasons explained below, the Court concludes that Kaiser is correct.

Under the EFTA, recurring transfers of the same amount may be "preauthorized" and further provides that:

> A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made.  A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing . . . preceding the scheduled date of such transfer . . . .

15 U.S.C. § 1693e(a).   No circuit, however, has directly addressed the question of when a cause of action accrues under the EFTA in this scenario.  The Sixth Circuit has come the closest, holding that, in the case of a recurring transaction, an EFTA claim accrues at the time of the first transaction, rather than at the time steps are taken to arrange the transfers.  *See Wike v. Vertrue, Inc.*, 566 F.3d 590, 592-93 (6th Cir. 2009).  The question here, though, is a slightly different one: does the cause of action accrue *once* for all recurring transfers at the time of the first transfer, or *repeatedly* at the time of each individual transfer?  There is very little case law—almost all of which is unreported—on the issue, and district courts have decided the question both ways.[2]

---

[2] *Compare Abrantes v. Fitness 19 LLC*, No. 16 Civ. 903, 2017 WL 4075576, at *4 (E.D. Cal. Sept. 14, 2017) (finding that the cause of action accrues with the first transfer because "rather than alleging a series of wrongful acts, Plaintiff has alleged a wrongful omission: failing to obtain written authorization for the series of transfers"); *Repay v. Bank of Am., N.A.*, No. 12 Civ. 10228, 2013 WL 6224641, at *4 (N.D. Ill. Nov. 27, 2013) ("[T]he EFTA does not require that the payee obtain a separate written authorization for each transfer. Instead, the payee must obtain a single written authorization for the entire series of transfers. Thus, once the series of transfers is initiated by the first transfer, the violation occurs and Plaintiff is harmed."), *with Zarate v. Chase Bank*, No. 22 Civ. 1178, 2023 WL 5956334, at *4 (E.D.N.Y. Sept. 13, 2023) ("The withdrawals at issue here are individual, independent transfers, even though the same person allegedly made each one, 'because [they are] new transfer[s] that cause[ ] new harm to [the] plaintiff in an amount ... "over and above" the prior transfers.'" (quoting *Diviacchi v. Affinion Grp., Inc.*, No. 14 Civ.10283, 2015 WL 3631605, at *10 (D. Mass. Mar. 11, 2015))).

This Court could find only one published case on point.  In *O'Malley v. Kass Management Services., Inc.*, the court considered a factual scenario similar to the one here.  *See* 539 F. Supp. 3d 935, 937 (N.D. Ill. 2021).  Looking to the statutory text and the EFTA's overall scheme, the court concluded that "each of the fund transfers must be treated as a separate 'occurrence' under [the EFTA]."  *Id.* at 943.  The *O'Malley* court noted that the EFTA contemplated preauthorized recurring transfers, yet the statute also framed the requirement for pre-approval, and conversely, withdrawal of authorization, as discrete acts.  *Id.* at 941-42.  The court noted that the statute thus allowed a consumer to provide or withdraw their pre-approval for the transfers "within any single period of recurrence."  *Id.* at 942.  Given this framework, the court observed that violations of the EFTA for recurring transactions "need not be consecutive, and it would be odd to treat non-consecutive violations as a single 'occurrence' that accrues only on the earliest violation."  *Id.*  The *O'Malley* court also looked to differences between the EFTA and the Truth in Lending Act, where Congress used the same language regarding the limitations period but, in the latter, explicitly pegged accrual for recurring transactions to "the first regular payment."  *Id.*[3]  The court concluded that "if Congress wanted to start the clock on the first transfer, then it could have said so . . . ."  *Id.*[4]

---

[3] *Compare* 15 U.S.C. § 1693m(g) (under the EFTA "any action under this section may be brought in any United States district court . . . within one year from the date of the occurrence of the violation."), *with* 15 U.S.C. § 1640(e) (under the Truth in Lending Act "any action under this section may be brought in any United States district court. . . within one year from the date of the occurrence of the violation or, in the case of a violation involving a private education loan . . . , 1 year from the date on which the first regular payment of principal is due under the loan.").

[4] Kaiser also suggests that the statute of limitations does not apply because he only discovered the withdrawals in February 2025.  FAC ¶ 32; Pl. Opp'n at 9.  Courts, however, "are disinclined to apply the discovery rule to EFTA claims because typically, as here, a plaintiff would have discovered the fraudulent transfers through the exercise of due diligence—*i.e.*, simply opening the monthly bank statements."  *See, e.g.*, *Ham v. JPMorgan Chase Bank, N.A.*, No. 23 Civ. 5698, 2024 WL 1345078, at *4 (W.D. Wash. Mar. 29, 2024).

This Court is persuaded by this reasoning.  Thus, each withdrawal made between August 13, 2020—when Mrs. Kaiser purportedly authorized Defendants to debit the Kaiser family bank account—and May 2, 2024—when Kaiser filed this lawsuit—are independently accruing violations of the EFTA.  Due to the one-year statute of limitations, however, any EFTA claims based on transfers made prior to May 2, 2023 are time-barred, while any such claims based on transfers on or after that date are not.

### B.    Merits

The EFTA is implemented under Regulation E.  12 C.F.R. § 1005.1.  According to Regulation E, an entity seeking authorization for recurring transfers from a consumer's bank account must: (1) obtain written authorization from the consumer, and (2) provide a copy of that authorization to the consumer.  *Id.* § 1005.10(b).  Telephonic verbal authorization may comply with these requirements, so long as those authorizations also comply with the E-Sign Act.[5]  CFPB Compliance Bulletin 2015-06 at 3-4 (Nov. 23, 2015).  For purposes of the EFTA, "consumer" is defined as "a natural person."  12 C.F.R. 1005.2(e).  Kaiser asserts that, because Mrs. Kaiser was not a party to the policy, her authorization is insufficient to satisfy the EFTA requirements.  FAC ¶¶ 27-28.  For their part, Defendants argue that because Mrs. Kaiser is "a natural person" who is joint account holder on the Kaiser family bank account and an authorized payer on the policy, she is "the consumer" within the meaning of the EFTA.  Defs.' Supp. at 14-16.

The Court can find no authority, and Defendants do not point to any, for the contention that a joint account holder, simply by virtue of being a "natural person," is a "consumer" who can

---

[5] An electronic signature under the E-Sign Act is "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record."  15 U.S.C. § 7006(5).  An electronic record is "a contract or other record created, generated, sent, communicated, received, or stored by electronic means."  *Id.* § 7006(4).

authorize a recurring payment under the EFTA on behalf of a plaintiff who has a contractual relationship with the defendant.  But there is some authority for the proposition that "the consumer" does *not* mean any "account holder."  *See Abyaneh v. Merchs. Bank, N.*, 670 F. Supp. 1298, 1299 (M.D. Pa. 1987) (noting that "there is no indication in the legislative history [of the EFTA] that Congress intended 'consumer' to be synonymous with 'account holder.'") (citing *Kashanchi v. Tex. Com. Med. Bank, N.A.*, 703 F.2d 936, 938 (5th Cir. 1983)).

Indeed, this makes logical sense.  Regulation E uses the term "*the* consumer," not "*a* consumer," and the choice of article serves an important function.  In using the word "the," Regulation E describes a relationship between the authorizer and the entity seeking authorization. While Mrs. Kaiser is indeed "a natural person," she is not "the consumer" under the EFTA, because she has no direct relationship to Defendants.  Mrs. Kaiser is not a party to the insurance policy; while she may have been authorized as a "payer," the policy does not give the "payer" the authority to change the method of payment.  Kaiser himself is "the" consumer because he is the person who has the contractual relationship with Defendants.  As alleged, Defendants did not receive Kaiser's authorization to change the method of payment, as is required by the policy.  Defendants did not receive his authorization to withdraw money from his bank account.  And Defendants did not provide written confirmation of that purported authorization.  Accordingly, Kaiser has stated a claim under the EFTA.

For these reasons, Defendants' motion to dismiss Count 1 is **DENIED**.

### III.    Conversion

Kaiser claims that, because Defendants did not have authority to change the payment method, they "intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to [Kaiser], interfering with [Kaiser]'s right of possession[,]" and thus engaged in conversion.  *See Delco Elec. Corp. v. Wells Fargo Cap. Fin., Inc.*, 265 F. Supp. 3d 213, 220

(E.D.N.Y. 2017); Pl. Opp'n at 9.  Defendants contend that they had permission to withdraw the funds from Kaiser's bank account because Mrs. Kaiser, a joint account holder, authorized the withdrawals.  Defs.' Supp. at 25.[6]

### A.   Statute of Limitations

"For Statute of Limitations purposes, an action for conversion . . . [is] subject to a three-year limitation period."  *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (N.Y. 1995); *see also Merlino v. Knudson*, 214 A.D. 3d 642, 645 (N.Y. App. Div. 2023).  Further, "accrual runs from the date the conversion takes place . . . and not from discovery . . . ."  *Vigilant Ins.*, 87 N.Y.2d at 44.  The Court can find no authority, and Defendants point to none, for the proposition that conversion claims involving recurring payments accrue, for statute of limitation purposes, at the time of the first payment.  For these reasons, each withdrawal made between August 13, 2020—when Mrs. Kaiser purportedly authorized Defendants to debit the Kaiser family bank account—and May 2, 2024—when Kaiser filed this lawsuit—are independent acts of conversion.  Due to the three-year statute of limitations, any conversion claim based on transfers made prior to May 2, 2021 are time-barred; any such claims based on transfers made on or after that date are not.

### B.   Merits

"The two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion or interference with it, in derogation of plaintiff's rights."  *Delco Elec. Corp.*, 265 F. Supp. 3d at 220.  Defendants argue that conversion is precluded by Mrs.

---

[6] Defendants also argue that the conversion claim is foreclosed because it relies on Kaiser's allegations that Defendants breached the contract.  Defs.' Supp. at 23.  The Court does not address this argument because Kaiser's breach of contract claim is based on the policy language, while his conversion claim is based on Mrs. Kaiser's purported authorization under the EFTA.

Kaiser's joint tenancy of the funds within the family bank account. Defs.' Supp. at 25. That is incorrect. While Mrs. Kaiser may indeed have joint tenancy, that does not negate Kaiser's possessory right or interest in the funds. *S.M.R.C., Inc. v. Watkins*, No. 13 Civ. 193, 2015 WL 5774777, at *10 (E.D.N.Y. May 4, 2015) (granting summary judgment where the relief sought would deprive one person of their ownership rights and interests in a jointly held account). And Kaiser, not Mrs. Kaiser, is the plaintiff in this case. Undoubtedly, then, Kaiser has adequately pleaded the first element of conversion.

Kaiser has also alleged facts that plausibly establish the second element of conversion: according to Kaiser, Defendants withdrew funds from his bank account without his written permission, in violation of the policy. FAC ¶¶ 27-28. While Mrs. Kaiser may have been authorized as a "payer" on the account, the policy states that "[p]remiums may be paid by any method . . . agreed to by the *parties*" (emphasis added) and that "[t]he method of payment may be changed by writing to [USAA Life NY]." Defs.' Supp., Ex 1, at 12. By implication, *only* the Owner or USAA Life NY may change the method of payment, because a person is not party to the policy merely by virtue of being a "payer" on the account. Accordingly, Mrs. Kaiser had no authority to reach any agreement with Defendants as to the method of payment. As alleged, Defendants thus improperly withdrew funds from Kaiser's bank account, thereby taking dominion over those funds, and interfering with his possessory right to his money. Defendants' motion to dismiss Count 5 is **DENIED**.

## IV.    Breach of Contract

To state a claim for breach of contract in New York, the plaintiff must establish four elements: (1) the existence of a contract; (2) performance of the contract by the plaintiff; (3) non-performance by the defendant; and (4) damages resulting from the breach. *Marks v. N.Y. Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999). Here, Kaiser contends that the policy was breached by

14

Defendants when Defendants continued to charge him for, and—it can be assumed—continued to provide him with, life insurance coverage beyond the "Selected Benefit Period," which is when Kaiser believed the policy to have terminated.  In other words, Kaiser argues that Defendants continued the terms of the contract beyond the contract's expiration date.

This argument is foreclosed by the express terms of the policy.  "On a motion to dismiss, the Court may dismiss a breach of contract claim for failure to state a claim if the terms of the contract are unambiguous and the 'plain language' of the contract contradicts or fails to support the plaintiff's allegations of breach."  *JTRE Manhattan Ave. LLC v. Capital One, N.A.*, 585 F. Supp. 3d 474, 482 (S.D.N.Y. 2022) (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156-58 (2d Cir. 2016)).  And "[a] contract is unambiguous . . . if 'the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion.'"  *Orchard Hill Master Fund*, 830 F.3d at 157 (quoting *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014)).

Kaiser asserts that the policy's cover page presents a "reasonable basis for a difference of opinion":

THIS IS A TERM LIFE INSURANCE POLICY WITH AN OWNER-SELECTED BENEFIT PERIOD FOLLOWED BY A DECREASING BENEFIT PERIOD.

PREMIUMS ARE GUARANTEED TO BE LEVEL FOR THE FIRST FIVE YEARS.

THE DEATH BENEFIT REMAINS THE SAME DURING THE SELECTED BENEFIT PERIOD.

UPON EXPIRATION OF THE SELECTED BENEFIT PERIOD, THE AMOUNT OF INSURANCE DECREASES ANNUALLY.

THIS POLICY MAY BE CONVERTED TO A PERMANENT LIFE INSURANCE POLICY.

THIS POLICY IS NOT PARTICIPATING -- NO ANNUAL DIVIDENDS ARE PAID.

Defs.' Supp., Ex 1, at 1; *see also* FAC ¶ 17.  According to Kaiser, "[a]ny consumer reading this language . . . would reasonably assume that the [p]olicy was operative only during the period **selected by the Owner** and then would expire unless the 'Owner' made another 'Selection[.]'" FAC ¶ 17 (emphasis in original).  Kaiser argues this ambiguity arises from the inclusion of the

15

option to convert the policy "to a permanent life insurance policy," and because the death benefits declined after the "Owner-Selected Benefit Period" expired. *Id.* This, according to Kaiser, suggests that there are only two ways the policy continues beyond the "Owner-Selected Benefit Period": through continued payment of premiums for reduced benefits, or through conversion of the policy into a permanent one. *Id.* Kaiser notes that "[t]he [p]olicy contained ***no language*** stating that USAA Life NY reserved the right to continue billing Plaintiff for reduced death benefits beyond the 'Owner-Selected Benefit Period[.]'" *Id.* (emphasis in original). Kaiser further points to the policy's Insurance Schedule as a point of ambiguity because "everything about the information provided . . . indicated that the 'Owner' had 'Selected' only a benefit period of '20 years,' expiring on January 3, 2022." *Id.* ¶ 19. Kaiser notes that "[***n***]***othing*** in the Insurance Schedule indicated that the 'Owner' had 'Selected' the [p]olicy to continue beyond the 20-year term by a single day . . . ." *Id.* (emphasis in original).

Kaiser's interpretation of the policy, however, is contradicted by its unambiguous language. Looking first at the language on the policy's cover page, the sentence: "This is a term life insurance policy with an Owner-Selected Benefit Period *followed by* a decreasing benefit period[,]" Defs.' Supp., Ex. 1, at 1 (emphasis added), unambiguously makes clear that after the Owner-Selected Benefit Period ends, there is a period where the benefits decrease, not—as Kaiser asserts—that the policy is terminated altogether. This is again made clear in the subsequent sentences: "The death benefit remains the same during the Selected Benefit Period. *Upon expiration* of the Selected Benefit Period, *the amount of insurance decreases annually*." *Id.* (emphasis added). Consistent with the first sentence, these terms explicitly convey that "Selected Benefit Period" denotes the duration for which the policy's benefits are fixed; then, after the Selected Benefit Period ends, the policy's benefits are reduced on an annual basis. Nothing indicates that "Selected Benefit Period" means "total duration of the policy," as Kaiser suggests.

16

Indeed, the policy's Insurance Schedule, which Kaiser points to as evidence of ambiguity, is consistent with the language on its cover page, especially when read in concert with the policy's definitions. According to the Insurance Schedule, the policy explicitly states that it began on January 3, 2002 and the "Selected Benefit Period"—defined as "the time period selected by the Owner *during which the death benefit remains the same*[,]" *id.* at 9 (emphasis added)—was 20 years. *Id.* at 3. The schedule does not end after 20 years, however, as would be expected if the Selected Benefit Period reflected the total duration of the policy's terms. Instead, the policy includes two expiration dates: the Selected Benefit Period Expiration Date, and the Final Expiration Date. *Id.* Plainly, the "Final Expiration Date" means the date on which the policy finally terminates altogether, and by implication, the earlier "Selected Benefit Period Expiration Date" means the date on which the death benefits no longer remain at the same level. And turning to the definitions, the "Selected Benefit Period Expiration Date" is defined as "the date upon which the Selected Benefit Period ends. *This is the date when the death benefit begins to decrease annually*." *Id.* at 9 (emphasis added). Once again, the policy's express language makes clear that the policy did not expire when the Selected Benefit Period expired, only that the benefit *changed* after the Selected Benefit Period ended.

The policy is unambiguous, especially when read in the context of the whole document. Because the policy expressly makes clear that it terminates after the Final Expiration Date, not after the Selected Benefit Period ends, Defendants did not breach the contract when they continued to charge Kaiser premiums after the Selected Benefit Period ended. For these reasons, Count 4 is **DISMISSED** with prejudice.

## V.    Common Law Fraud

The five elements of fraud are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance

17

on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (citing *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). Kaiser's fraud claim is premised on the notion that the policy is misleading, and Defendants therefore made a material misrepresentation or omission of fact. As discussed, however, the language of the policy unambiguously states that it continues after the Selected Benefit Period Expiration Date. This alone is sufficient to dismiss Kaiser's claim of fraud because the first element—a material misrepresentation—cannot be established. But even if Defendant's policy *was* misleading, Kaiser has not sufficiently pleaded the second and third elements of fraud. The complaint, on its face, does not allege any facts demonstrating that Defendants had knowledge of the allegedly misleading nature of the policy, nor that the Defendants had any intent to defraud Kaiser. Particularly in light the heightened pleading standard for allegations of fraud, Kaiser has failed to state a claim for fraud. Count 3 is **DISMISSED** with prejudice.

## VI. New York General Business Law

Kaiser also alleges that Defendants violated GBL § 349, which prohibits deceptive business practices. To state a claim under GBL § 349, a plaintiff must establish "(1) the act or practice was consumer oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result of those acts or practices." *Spagnola v. Chubb Corp.*, 573 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)). Kaiser asserts Defendants engaged in two deceptive practices in violation of the GBL. First, Kaiser claims that the policy's language itself resulted in a misrepresentation. FAC ¶¶ 17-21. Second, Kaiser claims that Defendants misled him when they changed the method of premium payments through Mrs. Kaiser. FAC ¶ 30. Both claims fail.

With respect to the original policy, Kaiser cannot establish the second element of a GBL § 349 claim—that the act or practice was misleading in a material respect—because the Court has

18

already held that the policy was not misleading.  But this claim also fails because it is time-barred. The statute of limitations for claims brought under GBL § 349 is three years.  *Schandler v. N. Y. Life Ins. Co.*, No. 09 Civ. 10463, 2011 WL 1642574, at *4 (S.D.N.Y. Apr. 26, 2011) (citing *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1082 (N.Y. 2001)).  "A party's cause of action under [GBL § 349] begins to accrue 'upon injury by the deceptive act or practice, i.e., when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief.'"  *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 430 (S.D.N.Y. 2009) (citing *Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 453 (E.D.N.Y. 2007)).  And, "[i]n a case involving alleged omissions or misrepresentations, the injury occurs when the omission or misrepresentation was made."  *Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 239 F. Supp. 3d 761, 788 (S.D.N.Y. 2017) (citing *Corsello v. Verizon N.Y., Inc.*, 18 N.Y. 3d 777, 789 (S.D.N.Y. 2012)).  Importantly, "[a]ccrual of a § 349 claim 'is not dependent upon any date when discovery of the alleged deceptive practice is said to occur.'" *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461 (S.D.N.Y. 2014) (citing *Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012)).  Therefore, in this case, the injury occurred when Kaiser signed the allegedly deceptive policy, roughly in 2001 or 2002, and the latest date he could have brought this claim was in 2005.

With respect to the change in the method of payment—Kaiser appears to abandon any GBL claim arising from this change.  *See* Pl. Opp'n at 11-16.  In any event, any such claim fails because Kaiser does not adequately allege the first element of a GBL § 349 claim.  To establish that a practice is consumer-oriented, "the plaintiff must 'demonstrate that the [defendant's] acts or practices have a broader impact on consumers at large.'"  *Bono v. Monarch Life Ins. Co.*, No. 05 Civ. 281S, 2006 WL 839412, at *2 (W.D.N.Y. Mar. 27, 2006) (citing *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (N.Y. 1995)).  This is done by

19

"alleg[ing] *facts* showing injury or potential injury to the public." *Id.* (emphasis in original). There are no facts alleged in the complaint to suggest Defendants used similar practices to change the method of payment with other customers. Accordingly, any GBL claim based on the change fails, and Count 2 is **DISMISSED**.

## CONCLUSION

For the reasons discussed herein, Defendants' Motion to Dismiss is **GRANTED** as to Kaiser's GBL, fraud, and breach of contract claims (Counts 2-4). Defendants' Motion to Dismiss is also **GRANTED** as to: (1) any EFTA claims based on transfers prior to May 2, 2023, and (2) any conversion claims based on transfers prior to May 2, 2021, as those claims are time-barred (Counts 2 and 5). Further, Kaiser has no standing to seek injunctive relief, and Defendants' Motion to Dismiss any claims to the extent that they seek such relief is **GRANTED**.

Defendants' Motion to Dismiss is **DENIED** with respect Kaiser's EFTA claims based on transfers on or after May 2, 2023, and Kaiser's Conversion claims based on transfers on or after May 2, 2021.

The parties shall confer and, within 14 days of this Opinion, submit an amended Civil Case Management Plan and Scheduling Order with a redline showing all differences between the original and revised filing.

The Clerk of Court is respectfully requested to terminate ECF No. 54.

SO ORDERED.

Dated: February 2, 2026

New York, New York

DALE E. HO
United States District Judge

20